Good morning, your honors. Tim O'Loughlin, O'Loughlin and Parris LLP. With me is Bill Parris, representing the plaintiffs and appellants. I'd like to start out with a quote to get right into the administrative record. It's from ER 530. It's from Scott Rumsey to Donna Darm, and it's talking about the issue of interbreeding. I found the literature pertinent to the co-occurring resident and anagramus omicus issue for all but the Central Valley and NorCal ESUs. My cursory review identified approximately 27 articles pertinent to this issue, and only two arguably present evidence suggesting that co-occurring residents are not part of the same interbreeding population as the anagramus form. Finally, I underscore the notion that co-occurring resident and anagramus omicus interbreed and produced the most established fact in the scientific literature by our managers, this is NIMS talking, by our managers and by 10 years of BRT, that's Biological Review Team, which is NIMS, although the frequency and magnitude is unknown. I should point out that Bob was not pressing the issue hard, but was scoping and hoping that there might be a way to carve out resident and anagramus omicus from the ESU. Let me ask you this, you didn't address the recent Supreme Court case. Which one? FCC versus Fox. I'll skip to FCC versus Fox if you'd like to right now. Well, and so how should we apply Fox to your challenge to NIMS change in policy? Well, I believe, and actually I'm glad you brought up, this is my second point, I believe Thank you. that the Fox case is directly on point here. It's interesting when you read that case, and it's a split decision, Scalia's on one side, Kennedy's kind of in the middle, and Breyer's on the end. But when you get down to it, it says you have to have, there's four criteria that are set out. A, that there are good reasons for the new policy, but it need not demonstrate to the court's satisfaction that the reasons for the new policies are better than the reasons for the old one. It suffices that the new policy is permissible under the statute. So the first argument we have is that on the interbreeds with mature, it is not because it's not permissible under the statute to change to DPS when this, when in fact this had been part of an ESU for over 14 years and subject to the original DPS policy that was adopted in 1966. That there are good reasons for it, we'll get back to that, and that the agency believes it to be better. Well, I'll give it that the agency believes it would be better because my whole theory here is that the agency was looking by hook or crook to try to get the anadromous form into a separate DPS so they didn't have to deal with resident rainbow trout. So let's focus on good reasons. And in this case, if you look at the language both by Scalia and Kennedy, there needs to be a reason explanation for disregarding the facts or circumstances that underlay or endanger or endangered by the prior policy. And then what Kennedy says, it is suffice to demonstrate the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its authority. Well, think about this case. In 1991, they adopted an ESU for Pacific salmonids. They put omicas in the Pacific salmonids. They didn't distinguish between resident and the anadromous form. It stayed there for over 14 years. They adopted a DPS policy in 1996 in which the U.S. Fish and Wildlife Service and NIPS found that the ESU for Pacific salmonids was not incongruent with the existing ESU policy. So we go on and on and on. The first time I was here, we won. Okay? And that was the ALSEA thing about whether hatchery fish are in or out, what we should do. Well, this case is entirely different. Here what we have is we have natural resident rainbow trout that can exhibit and do interbreed with anadromous forms of fish. And in fact, even resident rainbow trout can interbreed with each other and produce the anadromous form of omicas. And in this case, we don't have any geographical distribution or problems because we're all within the Central Valley. The drainages are all connected, so we're all set. So we went through the record. And this is what your charge is. It's not my charge. It's going to be your charge, is we went through the record. And if you look in the record, in June of 2005, everyone agrees that the fish are one and the same species and that they occur the same in the same thing. So you have to have both resident and non-resident fish or anadromous. Nothing happens after June. In fact, there's correspondence back and forth between NIMPS and U.S. Fish and Wildlife. There appears to be somewhat of a turf war going on about who's going to have control over this process. And then finally, in December, a mere five days before we're set to go, they decide that they're going to come up with a policy that is done in internal correspondence between lawyers and policy people, but no biologists. And they say that they're going to find that the resident form is not part of the species. And all we're asking for is, where is it in the record? Where is that in the record? And the only place, and if you read their brief, what's funny about reading the brief is... When you say that, where is that in the record? What is that? Where is the rationale and the justification that we had this fish, the anadromous and resident form, in this ESU for 15 years. They adopted the DPS policy in 1996 and said that it was fine, there was no problem, it worked with the current ESU. And then five days before they issue the final registered notice, they decide that, oh, it's different. And we said, okay, where is it in the record? Because if you read the cases, and if you read Breyer or Kennedy or Scalia, all we ask for is a reason, justification for why that occurs. Okay. And all they cite to is the administrative record in which they say, we find it to be different. Okay. Let me ask you something. Your client operates the irrigation canals and the irrigation system. Yes. Now, if this, if the two, if the rainbow and the steelhead, I'll just call them that. Okay. That's okay. If they look alike when they're, the inner breed. Yes. Okay. They look alike when they're little. Yes. They grow up, and then their behavior changes. Is that? Based on, in growing up, it may be seven years that they remain in the freshwater system before they decide to become the anadromous form. And so they look the same during that whole time. That is correct. Now, does that mean, as a practical matter, I'm just trying to understand the dynamics here. Does that mean, as a practical matter, if one of them is listed, that you can't tell which is which for, in doing your business? Is that the problem here? That is exactly one of the problems. And we pointed this out to the lower court. Unlike hatchery fish, remember the Trout Unlimited case that just recently got decided as well, too. You had hatchery fish, and there the court decided they had adipose fin, which is the back fin, and they clipped the fin. You could distinguish between what was a hatchery fish at that time and what was a native fish. And so then the court said under 4D, it made sense that you could take some hatchery fish for the good of the fishery. Here, it's even more complicated than that, because resident rainbow can interbreed with resident rainbow and produce the anadromous form. The anadromous form can interbreed with the resident form and produce either the or that. When we talk about anatomy, anatomy takes three forms. The fish move up and down within the freshwater system. Since we are in the Sacramento-San Joaquin Bay Delta, the fish can move up and down into the delta. And then finally, they can move up and down to the ocean. And the fish sizes range all over the board. The only way you can actually distinguish an anadromous omycus from a resident omycus is to take scale samples and do an otolithic test on it to determine if, in fact, it has gone to the ocean. Can I ask a follow-up question to that? Yes. Because that's helpful. Was that raised during the administrative proceedings? Was that all brought to the attention of the agency? Oh, yes. It's all in all the reports. It's known throughout the literature. It's in all the documentations. And the funny thing about this case, it's in their own BRT, and it was part of the OESU. And, in fact, the comments that were raised at the time that they came out with their Federal Register, their notice to proceed in November, the comments that were made applauded the fact that they were trying to get to this DPS. There's no question that we have declining steelhead stocks. Right. That is not even the issue here. We agreed with that at the lower court. We agree with it now. All we're saying is, if you're going to go to the DPS system, A, explain to us why you're doing it, and then explain to us why you're excluding resident rainbow trout, which you agree interbreed, when mature, with these fish. And then, unlike the Alsea case, and unlike the Trout Unlimited case, what they did in this case was very strange. They didn't talk about percentages. They didn't talk about geographic distribution. They didn't talk about their spatial and temporal differences, about timing or anything. They just said, interbreeding with mature is nice. But in this case, we're going to look at these differences between the residents in the anamorous form and determine, based on biology or the physiology, about why we can go someplace else. Our viewpoint is, Congress made it very clear, when you're at interbreeds with mature, that is the species level. And, in fact, there's an interesting quote I found in the Trout Unlimited case, and it says, likewise, the legislative history does not establish the clear intent of Congress. Isn't there something in the evidence that the interbreeding tends to make the rainbow population go up, but it doesn't make the steelhead go up? No, there's nothing in the record to that effect. The only evidence in the record that was submitted, and it actually was submitted by my clients, is that there are more resident rainbow trout below impassable barriers in the Central Valley. That's the only issue. There's no analysis, which is one of the things we'd look for, because one of the questions was, if they started interbreeding, how much of the resident, one of our questions was, how much of the resident rainbow trout population contributes to the steelhead population? I'm going to ask the other side, because I swear I saw something on that. Yeah, I did. Let me, as a legal matter, though, your principal issue appears to be that if they interbreed, then they can't be separated. That is correct. Okay. Well, and that's the starting point. We don't disagree with the Trout Unlimited case that once you get to defining the species, in fact, in the Trout Unlimited case, it says, initially it says, the composition phase, which is not influenced by whether hatchery fish threaten wild fish, it is concerned only with the neutral task of defining the species. And that's at page 618. And that's an important point, because in this case, what happened wasn't neutral. They skipped the interbreeding with mature and found physiological differences and went to that. If I could, I'd like to reserve my last three minutes. You may. Thank you. Thank you. Good morning. May it please the Court. My name is Anna Katselis, and I represent the National Marine Fisheries Service. With me at council table is Steve Mishuta for interveners, who will speak for five minutes of our time. The plaintiffs make two primary challenges to NIMS' decision to list Central Valley steelhead as threatened. First, they argue that the ESA's definition of species demands that a listed DPS include all organisms that have any level of reproductive exchange, such that NIMS cannot list steelhead unless it includes rainbow trout in the same listing. Second, they argue that NIMS did not adequately explain its decision to depart from its prior practice of applying ESU policy. I will address each of these in turn. The ESA's definition of species includes any distinct population segment of any species of vertebrate fish or The district court correctly rejected the district's contention that the phrase when should to breeds when mature mandates that a DPS include all organisms that have any level of reproductive exchange. Under NIMS' interpretation, which is embodied in the DPS policy which this Court has upheld, the members of a DPS must interbreed when mature, but a DPS need not include every organism that has some level of reproductive exchange with members of a DPS. This Court has previously determined that the DPS policy entitled to Chevron deference and is a permissible interpretation of the statutory language. Now, if you, under FOX, since you're changing a policy here, does that subject an agency's change of policy to a heightened standard of review? No. Not at all, Your Honor. The FOX decision is very clear that when an agency changes course, the retirement that it provide a reasoned explanation for its action is satisfied as long as the agency displays an awareness of its change and that there are good reasons for the change. The agency is not required to show that the reasons for a new policy are better than the reasons for an old one. This decision is very important to this case. It's the standard under which this Court analyzes this change, and certainly NIMS' explanation in this case meets this standard. They are focused, the plaintiffs have consistently focused on a tiny piece of the explanation. There's a whole decision-making path, a long path of decision-making. The agency has wrestled with the difference between anadromous and non-anadromous omicus for many years, dating back to 1997. It announced in a rulemaking or in a Federal Register notice that it was considering making the change in policy. It accepted that. When was that? I'm sorry. That was in the 2005 notice, Your Honor. Okay. There was, I mean, the history here is in 2004 NIMS proposed using the ESU policy after receiving numerous comments, including comments from Fish and Wildlife Service, it announced that it was reconsidering the ESU policy and then accepted the comments on applying the DPS policy. And then it explained in detail in its final decision its ultimate reason for change. The Court can certainly look at the entire decision-making path and it ---- Yeah. Let me ask you this, because I am troubled by the point. I'm speaking for myself and not for anybody else on the panel. But I am troubled by the problem that you can't tell the difference between these critters for seven years. And so, therefore, on the ground, they're going to have to treat them all the same to comply with the Act. And can you just help me out where in the administrative record is that concern dealt with? Well, certainly. I think that in the final rule, Your Honor, there are comments in NIMS' response to comments on that issue. And NIMS explains that ---- and this is not unique to this species where there are difficulties in distinguishing and determining what is listed and what is not. And that doesn't counsel or it doesn't suggest that it should be treated differently in determining what is listed. No, my concern is only that it was adequately responded to. Oh, it was responded to in the comments on the final rule. There's a response that explains that in dealing with that under ESA 4C, there is that the agency can prohibit the take of the nonlisted as well. That's correct. But I'm just wondering if the extent to which this creates a very practical problem, if that is dealt with. Well, that is the mechanism in which the agency, you know, errs on the side of the agency, and that is how it deals with that. And it's a difficult practical problem, Your Honor. Yes. And I understand your concern. But it doesn't counsel that you don't list the species or you don't protect the species or that you protect species. So what it ends up is you overprotect. Well, yes. That's the response, that you overprotect. That's the response. And it's the prohibiting of the taking of the form if you can't distinguish between the two. And again, we acknowledge it's a difficulty, but, you know, this is, I mean, the Endangered Species Act is intended to protect these species, and this is a mechanism that Congress expressly provided. What other cases do we give us guidance on that you can overprotect when you can't tell them apart? I don't have case citations for you, Your Honor, but it's in the Endangered Species Act itself, it's Section 4C, that provides for this. And that's explained in the rule as well. And that's the mechanism that Congress provided to do this. And the plaintiffs haven't made any challenge to this. I mean, there are arguments. This argument isn't before the court. It's only this, which interbreeds when mature. And, I mean, they have made two very narrow arguments. One, which interbreeds when mature includes, mandates the inclusion of all species and that have any rate, all organisms that have any rate of reproductive exchange. And two, that the agency didn't adequately explain its decision. With respect to the first argument, I think it's very significant, and we tried to point this out in our brief, but how significant the implications of their argument are. In the DPS policy, this Court has already upheld, does not look at only reproductive isolation. It looks at discreteness. Neither the DPS policy or the ESU policy requires absolute reproductive isolation. And as the agencies have explained in both of those policies, that is just not reasonable biologically. It couldn't be demonstrated for even, you know, species. At the species taxonomic level, there is some level of interbreeding. And it just doesn't follow from the statutory language. It's not a sensible interpretation at all. This Court applied Chevron deference to the DPS policy. It also applied Chevron deference to this exact language in the ALCE decision. So we don't think there's any question that NIMS is entitled to Chevron deference and that its interpretation is permissible. And on the change in policy, we think that the record provides a very detailed or very extensive reasoned explanation for NIMS' decision. And, again, it's not just they seem to make this argument that you can only look to one place in the final decision to see the decision-making rationale. But that's, I mean, that's not, there's nothing to support that. And the record here shows a long, careful decision-making process where NIMS addressed concerns, solicited comment, addressed concerns, and responded with a change in policy. And really, I think at the end of the day, both the ESU policies and the DPS policies are permissible, permissible interpretations of a statute that NIMS is charged with administering. And it was in NIMS' discretion to make a choice between those two. And the record also definitely shows that OMICUS are considerably different from other Pacific salmonids. The district court decision does that very well. Even if you look in the 2004 proposed rulemaking, the agency explains that they have perhaps, OMICUS has perhaps the most extensive suite of characteristics of any Pacific salmonid. So that's, I mean, numerous studies in the record show that. If there are no questions, I will give the balance of my time to interveners. Thank you. Are there any further questions for the Governor? Thank you. Good morning. May it please the Court. Steve Mishuta for the Intervenor Fishing and Conservation Groups. We support the agency's protection of steelhead here. And let me start, too, with the same e-mail that counsel from Modesto began with, Scott Rumsey's e-mail. It's ER530. It's the e-mail week. Yes. There's much more, too. But what Dr. Rumsey said in that e-mail was he couldn't find anything specific to the Central Valley. And the question in this case is not whether interbreeding between resident rainbow trout and sea run steelhead can occur or does occur. That is established in the science that generally that happens. The question here is does it happen in the Central Valley, and does that justify setting aside the protections for steelhead that the agency has developed here? And the answer to both of those questions are no. And I would just point the Court to the further excerpts of record submitted by Modesto in its reply brief where it cites one study that was done in the Central Valley. And that study looked at three fish, so I realize this is a thin reed to grasp, but three fish and found that two of them had been to the saltwater, one to the San Francisco Bay, one to the open ocean. And both of those fish had steelhead mothers. They looked at the third fish was a resident fish, spent its life in freshwater. That fish had a resident freshwater mother. So I'm not sure how this study supports the position that these fish regularly interbreed in the Central Valley and somehow demonstrates that it's happening all the time. And on that point, it's very important to note that if Modesto is correct and it is happening, and, again, we just don't know, then it's not having any effect on the steelhead population. We've seen continued declines ever since the agency first listed this fish back in 1997. When they looked at it again this time around, they found the declines are continuing. So if there was interbreeding and it were occurring, it's having no positive effect on the steelhead. And, Your Honor, you're absolutely correct that there is a study, studies in the record, showing that, and this is one reason why we want to protect steelhead, steelhead can give rise to a resident rainbow trout population. In fact, it's one of the benefits that they have for these populations over the long term. The opposite just isn't the case. It doesn't happen. There's indications in the record in the scientific studies that it's happened once, and there are questions around whether or not there was an introduced population in Argentina, whether or not the hatchery fish they took from up here and planted down there were actually steelhead instead of rainbow. But even if you put all this aside, looking at what the service did in 2004 when it was applying the ESU policy and it included resident rainbow trout as kind of an administrative assumption, a protective assumption, they still said you had to list because steelhead are irreplaceable. You simply can't have a population over the long term unless you're protecting steelhead. The service knows that steelhead are in trouble in this case. They looked in 2004 when they applied the ESU policy that Modesto prefers and said we still need to protect because of the declines in threats facing steelhead. That's what they did when they applied the DPS policy as well. So any way you slice it, steelhead need protection, and even if you include resident rainbow trout in the population, it's not going to change the listing result. Your Honor, you asked about the similarity of appearance issue. That was an issue in the district court. It's not up on appeal. But just very briefly, the mechanism that that's dealt with under the Act is Section 4D, which allows for special take rules. And so the agency had used that back in since 1997 under the first listing and would apply it here going forward as well. So that's how the similarity of appearance issue is dealt with. I just want to come back to this notion that because these two forms interbreed, that we ought to remove protection from steelhead because that's really what the argument is here. I'm not sure that Modesto is here arguing that this listing ought to be expanded to include resident rainbow trout that are co-occurring. I might be wrong about that, but my understanding is that the reason they have standing is because they argue that they're harmed by this listing, so they want the listing to go away. All of this, the generalities that we've been speaking in and that we heard from counsel about the interbreeding, none of these things are site-specific to the Central Valley. They haven't briefed remedy in this case. We did. They haven't responded to that. But we've also briefed all the science in this case, and they haven't responded to it other than to say that it's undisputed that interbreeding occurs. When you say that the similarity of appearance was an issue in the district court, did the district court make a ruling on it? I believe so. I was scrambling to try and find it, but I could be wrong about that. But we have addressed that issue before. In any event, that hasn't been appealed. It was either in this case or the former iteration of this case back in 2004, so I might be confused. Okay. And just to be clear, we support the government's interpretation of the interbreeds when mature language and also believe that the agency has adequately explained its decision here. And we urge the Court to uphold the district court's ruling. Thank you, Your Honors. And you finish with six seconds left. Thank you. It's always great to go sit back down and have your co-counsel tell you that your statement was wrong. In the record, the record denotes that the resident form of omicus is insufficient to maintain the anadromous form of omicus and not vice versa. You are correct. Actually, we like the Fox case, and we agree that there's not a heightened standard of review. We don't want a heightened standard of review. If you read our original pleadings in this case, we don't call for a heightened standard of review. What we're saying in this case, and this is why it's so clear-cut to me, the government says they have this whole decision-making path from 1997. We say baloney. We say in 2004, when we won in this court, you went back and you tried to do it again. Okay. And up and through June of 2005, nothing changed. In fact, the three panels that they empowered to do something and look at this came back with the exact same thing. Resident and anadromous are one species. After that, they go inside in their cubicles and with their e-mails, and they have lawyers and they have policy people. There's no biologists in those e-mails, and if you read them, and they cook up a scheme to protect the anadromous form of steelhead. Now, and it's up to this Court to go and look at that record and see whether or not under FCC, whether that is entitled, whether they have come up with reasoned decisions to change a 15-year policy. That's it. And you will make that decision. It will be yes or no. And I don't think that makes any difference at all. On the DPS policy, we agree with the statement that the DPS policy is entitled to Chevron deference. We're not arguing that. We're arguing the application of the DPS policy. And in the application of the DPS policy, they cannot ignore what Congress required. Congress said very specifically, interbreeds when mature. And this is not the case of Trout Unlimited or ALSEA. In Trout Unlimited, we were talking about hatchery fish and whether hatchery fish should be clipped or not clipped and to what extent they should be included or excluded. And in the ALSEA case, it was basically the same thing. And then in the other cases, they talked about this geographic scope where fish were in one basin, couldn't get to the other basin. We have none of that in this case. And I would be happy if you could find in the record for me and show me where they talk about those applications. The Modesto Irrigation District, we understand that the steelhead are in trouble. We have resident rainbow trout population. What we're asking for is a ESA policy that we can understand and apply on the ground that has a reasoned rationale basis behind it. Thank you. Thank you. The case just argued is submitted for decision. The Court appreciates the quality of the argument presented. Thank you.
judges: Lynn, Schroeder, Callahan